Commonwealth vs. John M. Palmer,

CASE 13—INDICTMENT—OCTOBER 5.

# Commonwealth vs. John M. Palmer.

**APPEAL FROM JEFFERSON CIRCUIT COURT.**

1. The declaration of martial law in Kentucky, whether right or wrong, valid or void, neither suspended the constitution of the United States nor stifled the laws of this State; and what that constitution and those laws, constitutionally enacted, denounced as a crime, martial law did not legalize.

2. A Major General of the U. S. Army, who, as military commandant of the Department of Kentucky, while martial law prevailed in the States, under the authority of the Secretary of War, issued an order compelling persons to carry slaves out of this State, and by means of which order slaves did escape, was guilty of the crime of aiding a slave to escape from her owner to another State, and liable to the punishment denounced against that crime by *section* 1, *article* 5, *chapter* 93, 2 *Rev. Stat., p. 370.*

3. An order of the Secretary of War of the U. S., commanding the aiding of slaves in Kentucky to escape from their masters, if issued, would not shield one who obeyed it from the penal consequences of his crime.

4. A violation of a criminal law will not justify a judgment of conviction if the law shall have expired or been repealed before judgment.

Jno. M. Harlan, Attorney General,          For Appellant,

CITED—

2 *Rev. Stat.,* 370.

13 *Howard,* 115 ; *Mitchell vs. Hammony.*

W. T. Ward & Son,                    For Appellee,

CITED—

1 *Bishop's Crim. Law,* 213, *sections* 213 *and* 48 *to* 68.

1 *Kent,* 410.

21 *Howard,* 506 *to* 516, *inclusive.*

*O'Brien on Court-Martial,* 25.

*Bennett on Court-Martial,* 11 *to* 14, *inclusive.*
*Attorney General Cushing's Opinion, Feby.* 5, 1863.
1 *Bishop's Criminal Law, notes* 2 *and* 3, *page* 64.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

The appellee, *John M. Palmer,* was indicted in the Jefferson circuit court of Kentucky for feloniously aiding *Ellen,* a slave of T. R. Womack, to escape from her owner, in violation of the 1*st section of article* 5, *chap.* 93, *of the Revised Statutes of this State, p.* 370, enacted for the purpose of preventing, as its title declares, *" the abduction and stealing of slaves, removing them out of the State by boatmen and others, and exciting them to rebellion,"* and containing the following provisions : " If any free person, not having lawful, or in good faith a color of claim thereto, shall steal, or shall seduce, or entice a slave to leave his owner or possessor ; or, if he shall make or furnish, or aid, or advise in making or furnishing, a forged or false pass or deed of emancipation, or other writing purporting to liberate a slave ; or if, in any manner, he aid or assist a slave to make his escape, or attempt to make his escape from such owner or possessor, he shall be confined in the penitentiary for a period of not less than two nor more than twenty years."

By proper specifications and averments the indictment charges *Palmer* with the crime of aiding *Ellen,* a slave of Womack, to escape from her owner in Kentucky to the State of Indiana.

On the trial the parties agreed that, at the time of the admitted escape as charged, martial law had been proclaimed in Kentucky ; that Palmer, as a major general of volunteers in the army of the United States, was commandant of the Department of Kentucky, and stationed at Louisville, and that the slave went to Jeffersonville,

---

Commonwealth vs. John M. Palmer.

---

Indiana, under cover of a passport issued for that purpose by a provost marshal, in obedience to the following order:

"HEADQUARTERS DEPARTMENT OF KENTUCKY,
        "LOUISVILLE, KY., May 11th, 1865.

"*General Order No.* 32.

"Whereas, it has been represented to the general commanding the Department of Kentucky, in an official communication from the Hon. Philip Tompert, mayor of the city of Louisville, and Henry Dent, S. A. Hartwell, John S. Hubbard, and John G. Baxter, a committee of the general council of said city, that large numbers of negroes, most of them women and children (and the numbers are increasing daily) have flocked to said city, *claiming to be free, and looking to the military authorities for protection and assistance;* and that such colored persons have been compelled to seek shelter where they could find a place; and by reason of the crowded state of the city, and the scarcity of houses, they have crowded together in numbers so great at each place as to render disease almost certain; and that small-pox is now, from the cause aforesaid, prevailing in several localities in the city among these people; and the said mayor of the city of Louisville, and the committee of the general council, have requested the co-operation of the general commanding to remove said evil from the city. As an effectual co-operation with the city authorities, and to prevent the spread of disease among the people, all colored persons in the city of Louisville are advised at once to seek employment; and such as are unable to find sufficient employment for the support of their families in the city are advised to seek it elsewhere. To enable them to do so, it is ordered that the provost marshal of the post of Louisville, upon the application of any colored person

who may report him or herself as unable to find suffi-
cient employment in the city of Louisville, will issue a
pass to such colored person and for his or her *family*,
specifying the number of persons to be passed, and their
names, and the point to which *they wish* to go to engage
in or in search of employment.

" Conductors and managers of *all* railroads, steamboats,
ferry-boats, and other means of travel out of and from
the city of Louisville, will, upon the presentation of such
pass and the payment of the usual fare, transport the
persons named therein.

"Any conductor or manager of any railroad, steam-
boat, ferry-boat, or other means of travel, will be at once
arrested and sent out of the department, or punished as
a military court may adjudge.   The commanding officer
of the post of Louisville will adopt the necessary meas-
ures for carrying into effect the provisions of the above
order.

" By command of Major General J. M. Palmer.
          " J. Bates Dickson, *Capt. and A. A. G.*

It was also admitted that martial law had been abol-
ished before the grand jury found the indictment " a true
bill," and that the foregoing order " was issued by Gen-
eral Palmer, by the *authority* of the War Department."
It was agreed " that the court might dispose of all the
legal questions arising on the indictment and these
agreed facts."

Under that submission, the circuit judge, on December
8th, 1865, declining to decide on the legal effect of the
facts, but assuming judicial knowledge of the abolition
of slavery by the adoption of the constitutional amend-
ment to that end, quashed the indictment and discharged
the accused, and only because, as he adjudged, Ellen
then not being a slave, a verdict of guilty would not

authorize a judgment of conviction any more than if the statute itself had been repealed. And this is the judgment of which the Commonwealth now seeks the reversal.

If, on the agreed facts, the appellee was not guilty of a punishable crime, this court should not reverse a right judgment merely because it resulted from a wrong reason, and, therefore, before we consider the reason, we must, as a necessary preliminary, decide whether the appellee was guilty of a felony, or whether his wrongful act was justifiable or excusable by the law of the land. Martial law in KENTUCKY—always a champion of the Union—still self-sacrificingly adhering to it in its severest trial, *and thereby saving when her recreance would have destroyed it*—was as causeless as it was ungrateful and humiliating. But, whether right or wrong, valid or void, it certainly never either suspended the Constitution of the United States or stifled the laws of the State. What that Constitution and those constitutional laws denounced as a crime, martial law did not legalize, nor could it have abolished the institutions, or legally changed the domestic rights and relations of a noble State so devotedly adhering to the Union, and so gallantly shedding her blood to save it, and *restore* its supremacy and harmony.

President Lincoln's proclamation of emancipation, whatever else might be said of it, excepted Kentucky from its operation, and applied exclusively to the seceding States. That portentous document, therefore, afforded no semblance of pretext for a claim to freedom by the slaves of Kentucky. The unlawful intermeddling of General Palmer inciting a spirit of servile insurrection, and encouraging escapes from servitude, by assuring military protection, invited slaves to "*crowd*"

Camp Nelson and other encampments of his army; and induced many of them to "rush" to Louisville, "claiming to be free," and *expecting* the aid of his army in the assertion of that claim; and, after deserting comfortable homes, where they had been employed and fed and clothed, they, as he knew, falsely pretended that they were free, and could get no employment; and he had no right to help them to escape from their owners, and to secure that object by requiring officers of railroads and steamboats, in violation of their legal obligations, and at the peril of the penitentiary, to carry them whithersoever *they* might choose to go in or out of Kentucky. His Order 32, though *ostensibly* confined to the negroes "crowding" Louisville, was, nevertheless, with his knowledge and countenance, used as similar license in and executed throughout the whole State, and under its cover, with his sanction, slaves "crowded" around provost marshals, and obtained passports, until but few were left at home, and farmers generally, and many residents of cities and towns, were suddenly left without their accustomed and necessary help, the long-established system of labor terribly disturbed, and citizens excited almost to revolution. The tradition of these pregnant facts was so universally notorious as to be stereotyped as local history, of which this court, if it know anything, must have judicial knowledge.

The circumscribed Order No. 32 must have been issued under a false pretense ingeniously fabricated, and intended to operate, as it did, on all the slaves in Kentucky. Palmer knew that he had no right to liberate the slaves in Kentucky; and yet, by assuring them of his military "aid and protection," he induced them to desert their owners, and gave them practical freedom;

and this, and this alone, was the thinly disguised object of his Order No. 32. And was all this authorized by the War Department? We will not believe it. But however this may be, to *authorize* is not to *order*—the one is mandatory, the other merely permissive and discretionary, and, according to the facts, the whole drama was the voluntary act of General Palmer, as the originating and ruling spirit, not controlled, but only uncontrolled, by the War Department. But, had he pleaded a peremptory order, it could not have shielded him from the penal consequences of an illegal act of glaring usurpation.

Aiding Kentucky slaves to run away from their owners was not a belligerent act justified by the war. It could not subserve any legitimate purpose of the war against the rebellion. Instead of strengthening, it weakened the Federal cause. Neither the Secretary of War nor even the Federal government, therefore, had constitutional power to abolish slavery in Kentucky by military force, nor to take the property of her citizens and throw it away. Any such order would have been unconstitutional and void. And a void order is no justification. Had there even been such an *order* in this case, General Palmer would have been as guilty for his passport as he could have been of robbery had he, under the like pretence, robbed the Kentucky Bank of all its money for his own use. He pleads, however, no such *order*. And had the Secretary of War known the disguised purpose and actual consequences of Order No. 32, we must presume that he would not have sanctioned it. But if he ordered it or connived at or encouraged it, he, too, was guilty of an unholy and criminal conspiracy against the Constitution of the Union and the laws of Kentucky.

Commonwealth vs. John M. Palmer.

Then, according to the law and the admitted facts, John M. Palmer was guilty of the felony well-charged in the indictment.

This inevitable conclusion brings us to the consideration of the only suggested or remaining ground of the judgment below, and that is, as before stated, that Ellen was not a slave when the judgment was rendered.

A violation of a criminal law will not justify a judgment of conviction if the law shall have expired or been repealed before judgment, because, in such a case, there is no ground for the conviction to stand on—*none to authorize punishment.*

But in this case the statute, for violating which the appellee was indicted, was in full force when the indictment was dismissed, and authorized a judgment for its prescribed punishment.

Ellen's emancipation could have had no more effect on the prosecution than her death while a slave would have had, nor as much as her death would have had on an action of trespass for her abduction. And in neither form of procedure could it cure or excuse the wrong or avert judgment of conviction.

No jurist or enlightened man could doubt that, in a prosecution for horse-stealing, the death of the stolen horse, after the theft, could not prevent a judgment of conviction according to the then existing law. And the parallelism between that case and this is complete in principle and reason. And, consequently, the error of the circuit judge in dismissing the indictment is too evident to require or permit grave argument further to illustrate it.

The effect on this prosecution of the late repeal of the statute since the dismission of the indictment, cannot be

now judicially anticipated by this court. It will depend on the legislative intent as to its operation on crimes committed before the repeal; and the interpretation of the repealing act is not involved in the only question now before us—did the circuit court err in dismissing the indictment? And adjudging that it did, our revisory jurisdiction is exhausted.

Wherefore, the judgment dismissing the indictment in this case is reversed, and the cause remanded for further proceedings.

JUDGE WILLIAMS DELIVERED A SEPARATE OPINION AS FOLLOWS:

The appellee was indicted in the Jefferson circuit court for feloniously aiding the slave of T. R. Womack to escape from the State, by a military order, in violation of our statute, making it felony to aid the slave of another to so escape. (*Art.* 5, *chap.* 93, 2 *Stant. Rev. Stat.*, 370.)

Upon the following agreed facts the court dismissed the indictment, to-wit: That civil war was then flagrant in the United States; that appellee was a major general in the United States army, and in command of the Military Department of Kentucky; that the State was under martial law, and that he had authority from the War Department of the United States to issue the order by which said Womack's slave was enabled to escape.

The reasons assigned by the court for the dismissal was, that it had judicial notice that the amendment to the constitution of the United States abolishing slavery had been adopted, and that this abrogated the State statute. This dismissal was entered December 8, 1865. The proclamation of the Secretary of State of the United States that said amendment had been adopted was not issued until December 18, 1865, and as by law the Sec-

retary of State of the United States is the only authority. authorized to proclaim the adoption of an amendment to the United States constitution, no court or officer could take official notice of its adoption previous to the announcement by the Secretary of State.

Nor could said amendment have the effect to abrogate previous rights or responsibilities, either civil or criminal, incurred under State laws; and for these reasons the case must be reversed.

But it is not necessary to decide now that a military officer of the United States, in command of a military department when civil war was flagrant and martial law declared therein, and authorized by the War Department to issue an order that may be in conflict with a State enactment, can be held criminally responsible for the violation of such statute, as the essential ingredient of a criminal intent might be wanting, and only the intent to enforce what he honestly but erroneously supposed to be the law, rights, and legal orders of his own government, might have been the controlling motive.

As the authority to issue such orders from the War Department of the United States is an agreed fact, I do not feel authorized to disbelieve it, especially as the War Department never interfered to correct this order, so injurious to the interest and harassing to the feelings of the people of Kentucky.

And as said *article* 5, *chapter* 93, *Revised Statutes*, has been repealed by an act of February 15, 1866, *subdivision* 5, *section* 2, *Supplement to the Revised Statutes by Myers*, 737, without reserving to the courts the right to enforce its penalties already incurred, it is impossible, under our laws, to inflict any punishments for its violation; and however responsible General Palmer may be to those

injured by such order in a civil action, he is not now criminally answerable.

And although on the return of the cause the court should now dismiss the indictment, because there is a legal reason for so doing, yet no such reason existed when the dismissal was made, and it was therefore erroneous.

For these reasons I concur in the determination of reversal.